**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No. 1:18-cr-00210 |
| v. : | |
| : | (Judge Kane) |
| ANTHONY GILBERT-BROWN and : | |
| VINCENT DESHIELDS, : | |
|     Defendants : | |

**MEMORANDUM**

Before the Court are Defendants Anthony Gilbert-Brown and Vincent Deshields ("Defendants")' motion to suppress evidence pursuant to the Fourth Amendment to the United States Constitution. (Doc. No. 40.) For the reasons explained herein, the Court will grant in part and deny in part the motion.

**I.  BACKGROUND**

    **A.  Factual Background[1]**

On the night of February 19, 2018, Officer Bradley Engle ("Officer Engle"), a patrol officer with the City of York Police Department, was traveling east on Jefferson Avenue in York, Pennsylvania when he observed a red Mazda that matched the description of a vehicle that had been previously reported as stolen traveling in the opposite direction on Jefferson Avenue. (Doc. No. 64 at 3:20-24, 5:4-8.) Officer Engle then turned his patrol vehicle around and began pursuing the vehicle. (Id. at 5:7-9.) As Officer Engle began to follow the Mazda, the occupants exited the vehicle while it was still in motion and fled the area on foot. (Id. at 6:13-16.) The

---

[1] Unless otherwise noted, the facts recited herein are derived from the transcript of the suppression hearing held by the Court on March 12, 2019. (Doc. No. 64.) During the suppression hearing, the Court heard testimony from Officer Bradley Engle ("Officer Engle"), Alvin Hart ("Mr. Hart"), Tammy Englehart ("Ms. Englehart"), and Trooper Jason Groff ("Trooper Groff").

vehicle continued to roll until it struck a building and came to rest near the intersection of Jefferson Avenue and Smith Street. (Id. at 5:10-13, 6:16-18.) One of the occupants of the Mazda ran down Smith Street, a one-way street, and Officer Engle drove his patrol vehicle to "approximately mid-block" on Smith Street, exited his patrol vehicle, and briefly pursued the individual on foot. (Id. at 7:19-25, 8:1.) He was unable to arrest any of the occupants of the Mazda. (Id. at 7:22-23.)

Officer Engle testified that after he lost sight of the occupants, he sought to return to the area where the Mazda had been abandoned near the intersection of Jefferson Avenue and Smith Street in order to establish a crime scene because, in his view, fleeing individuals often "dump guns [and] drugs." (Id. at 8:23-25, 9:1-4.) Officer Engle further stated that he chose to reverse his patrol car instead of turning it around because Smith Street is a very narrow one-way street, and that while he reversed back toward the intersection of Jefferson Avenue and Smith Street, his patrol vehicle's emergency lights were activated. (Id. at 8:21-23.)

Prior to reaching the intersection of Smith Street and Jefferson Avenue, Officer Engle observed a white vehicle turn onto Smith Street, blocking his way as he sought to reverse toward Jefferson Avenue. (Id. at 9:10-13, 16-17.) Officer Engle "chirped" his patrol vehicle's siren to alert the white vehicle to back up so that he could continue traveling in reverse toward the intersection where the Mazda had come to rest and so that he could establish a crime scene. (Id. at 9:13-15.) The white vehicle reversed onto Jefferson Avenue, giving Officer Engle the necessary space to put his patrol vehicle in the middle of the intersection. (Id. at 9:16-19.) According to Officer Engle, at that point his patrol vehicle was positioned in such a way that a vehicle seeking to pass through the intersection of Smith Street and Jefferson Avenue would have to "attempt to go up on the curb or get very, very close to [Officer Engle's] patrol vehicle."

2

(Id. at 10:3-6.) Once the white vehicle came to a stop on Jefferson Avenue, Officer Engle exited his patrol vehicle and used a handheld flashlight to motion to the white vehicle to turn around because, given the positioning of his patrol vehicle, there was "no way to get through" on Jefferson Avenue. (Id. at 11:10-17.) Officer Engle also gave verbal commands to the occupants of the white vehicle to turn around. (Id. at 11:18.) While another vehicle did successfully turn around and travel the opposite direction on Jefferson Avenue, the white vehicle did not turn around and continued to "slowly drive and attempt to get around, squeeze in between [Officer Engle's] patrol vehicle and the wrecked Mazda." (Id. at 11:19-25.)

As the driver of the white vehicle attempted to go around his patrol vehicle, Officer Engle approached the white vehicle and gave additional commands to the driver of the white vehicle, Defendant Gilbert-Brown, to turn around. (Id. at 13:15-20, 16:22-23.) Officer Engle testified that he gave Defendant Gilbert-Brown verbal commands and accompanying hand gestures to turn around "approximately five to six times." (Id. at 14:9-13.) Despite this directive, Defendant Gilbert-Brown continued to attempt to get around Officer Engle's patrol vehicle. (Id. at 14:18, 90:1-6.) Officer Engle testified that at that time, he observed that Defendant Gilbert-Brown had bloodshot eyes that had a "glossy tint to them" and had a "thousand-yard stare." (Id. at 13:20-24, 18:20-22.) As Defendant Gilbert-Brown came close to entering the crime scene in the white vehicle, Officer Engle gave approximately two to three verbal commands to Defendant Gilbert-Brown to "stop the vehicle and get out and turn the vehicle off." (Id. at 14:18-23.) Officer Engle testified that he gave these commands loudly because he noticed that the driver's side window was rolled up. (Id. at 14:23-25.) According to Officer Engle, because Defendant Gilbert-Brown had ignored multiple commands, was crossing into a crime scene, had a "thousand-yard stare,"

and appeared to be involved with the occupants of the Mazda, he decided to detain Defendant Gilbert-Brown to conduct an investigatory stop. (Id. at 19:14-25, 20:2-5.)

Once Officer Engle gave the commands to "stop the vehicle and get out and turn the vehicle off," however, Defendant Gilbert-Brown, still in the white vehicle, began to travel in reverse away from Officer Engle before abruptly putting the white vehicle in drive again and traveling directly toward Officer Engle. (Id. at 20:7-10.) The bumper and hood of the white vehicle made contact with Officer Engle on his left leg, near his knee and shin area. (Id. at 20:10-18.) Upon being struck by the white vehicle on his left leg, Officer Engle placed his hand on the hood to try to get away from the white vehicle. (Id. at 20:20-22.) Defendant Gilbert-Brown continued to travel forward into Officer Engle, pushing him, at which time Officer Engle, fearing "serious bodily injury," drew his service weapon and fired four to five rounds into the windshield. (Id. at 20:24-25, 21:1-4.)

After Officer Engle fired shots into the windshield of the vehicle, Defendant Gilbert-Brown reversed at a high rate of speed and struck Officer Engle's patrol vehicle. (Id. at 21:11-14.) Officer Engle testified that he gave more commands to "stop the vehicle and get out," with which Defendant Gilbert-Brown did not comply. (Id. at 21:14-17.) After hitting the police vehicle while traveling in reverse, Defendant Gilbert-Brown traveled forward again toward Officer Engle at a "high rate of speed" and then stopped. (Id. at 21:15-17.) Officer Engle continued to give commands to "stop the vehicle" and "put your hands up" throughout this encounter. (Id. at 21:17-21.) Officer Engle then manually activated his body camera because the camera had not been activated when his patrol car's emergency lights had been turned on.[2] (Id.

---

[2] The video footage captured by Officer Engle's body camera was introduced as Government Exhibit 5 during the suppression hearing. (Id. at 23:3.)

at 23:1-2.) After the white vehicle came to a complete stop, Officer Engle continued to give verbal commands for the occupants of the white vehicle to "keep your hands up" because the passenger in the white vehicle was "bending over and reaching towards the floorboard of the vehicle," taking his hands out of view. (Id. at 23:25, 24:1-5.) Officer Paul Thorne of the York City Police Department ("Officer Thorne") arrived and assisted Officer Engle with the arrest of Defendants. (Doc. No. 40-1 at 7.) Once in custody, both Defendants were searched incident to arrest. (Id.) Recovered from Defendant Gilbert-Brown were: "eleven clear plastic baggies; 23 U.S. twenty-dollar bills totaling $460; nine U.S. ten-dollar bills totaling $90; one U.S. five-dollar bill totaling $5; and five U.S. one-dollar bills totaling $5." (Doc. No. 64 at 137:23-25, 138:1.) Defendant DeShields was found to possess: "four U.S. twenty-dollar bills, totaling $80; one ziplock bag with marijuana; one Bluntville Cigarillo; one glassine knotted bag containing white chalky substance; one Samsung flip phone; one white lighter; and one key ring with five keys." (Id. at 138:5-9.)

In York County, Pennsylvania State Police policy provides that Pennsylvania State Police Criminal Investigations Division ("CID") "take[s] over" the investigation when there is an officer-involved shooting. (Id. at 97:16-19, 139:4-14.) Trooper Jason Groff ("Trooper Groff"), a trooper with CID, received a call and was dispatched to the scene after the incident occurred. (Id. at 95:1-2.) Upon Trooper Groff's arrival, he met with Officer Thorne and took possession of evidence obtained by the York City Police Department during the arrest of Defendants. (Id. at 95:18-23.) Trooper Groff also interviewed both Defendants. (Id. at 96:11-24, 97:1-9.) During his interview with Trooper Groff, Defendant Gilbert-Brown indicated that he had been operating the white vehicle despite having a suspended driver's license. (Id. at 100:20-23.) Trooper Groff testified that Defendant Gilbert-Brown stated during this interview that Officer Engle had

5

motioned for Defendant Gilbert-Brown to go around his patrol vehicle "by pointing," but that no verbal directions had been given to him. (Id. at 121:19-25, 122:1-10.)

During a conversation between Trooper Groff and Officer Thorne that took place at approximately 11:50 P.M. that night, Officer Thorne stated that the white vehicle had been searched incident to the arrest of Defendants, and items of contraband located. (Id. at 130:1-8.) Officer Thorne further told Trooper Groff that "[h]e observed a Glock Model 23" with serial number VGR851 in plain view, "sitting in the center console of the cup holder." (Id. at 130:12-17, 133:4-8.) Also recovered from inside the white vehicle were: "one magazine with bullets; one lone bullet that was removed from the firing chamber of the Glock [Model 23] . . . one black digital scale; two large knotted glassine bags with white chalky substance; one small knotted glassine bag with white chalky substance; one small knotted bag with marijuana; one white iPhone with a certain serial number ending in 3385; one ripped vacuum-sealed bag." (Id. at 135:19-25, 136:1-3.)

Trooper Groff testified that the white vehicle was subsequently towed to a Pennsylvania State Police lot because it was blocking a lane of traffic and both occupants of the vehicle had been arrested and could not drive it. (Id. at 147:3-9.) Further, according to Trooper Groff, the white vehicle was considered evidence because it had bullet holes in it "and it was used as a weapon against an officer." (Id. at 147:9-13.) Trooper Groff also testified that prior to towing the vehicle, Pennsylvania State Police policy provides that the vehicle would be subject to an inventory search for "valuables and other items." (Id. at 136:21-21, 137:1-3.) Trooper David Howanitz ("Trooper Howanitz") of the Pennsylvania State Police Forensic Services Unit processed the crime scene and took photographs of the white vehicle. (Id. at 136:4-19.) While Trooper Howanitz was processing the scene, he located "one black Hi-Point Model C9, 9-

millimeter handgun, with serial number P1481563 . . . one 9-millimeter magazine from that Hi-Point handgun . . . eight NFCR 9-millimeter ammunition . . . inside the above-listed magazine . . . four Federal shell casings . . . seven paint chips . . . the 2016 white Chevrolet Cruze with [Pennsylvania] [r]egistration GFV 0643 . . . and the ignition key for the Chevrolet Cruze." (Id. at 137:9-20.)

After the car was towed to a Pennsylvania State Police lot, Trooper Groff obtained a search warrant for the white vehicle, which was executed on February 21, 2018. (Id. at 138:10-12; 20-21.) That search yielded: "one bullet; one knotted glassine bag containing suspected crack cocaine; one pink Apple iPhone with ending Serial Number 944A; one black Go Smart flip phone with ending Serial Number 7195; one marijuana blunt; one PennDOT suspension letter addressed to Defendant Gilbert-Brown; and two boxes of Dutch Master Cigarillos." (Id. at 138:13-19.)

### B. Procedural Background

On June 27, 2018, a grand jury returned an indictment charging both Defendants with conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and charging Defendant Gilbert-Brown with three counts of distribution of a cocaine base in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. (Doc. No. 1.) An arrest warrant was issued as to Defendants on June 27, 2018. (Doc. Nos. 8, 9.) On July 10, 2018, Defendant Gilbert-Brown entered a plea of not guilty (Doc. No. 16), and on July 25, 2018, Defendant Deshields entered a plea of not guilty as to the aforementioned charges (Doc. No. 28). On September 21, 2018, Defendant Gilbert-Brown filed a motion to suppress evidence under the

Fourth Amendment to the United States Constitution, seeking suppression of "all the items seized by Officer Paul Thorne and/or other York County Police Department officers at the scene on February 19, 2018, and all additional items seized as a result of the subsequent search conducted on February 22, 2018, pursuant to the Search Warrant issued February 21, 2018." (Doc. No. 40 at 6.) Defendant Deshields joined in the motion. (Doc Nos. 57, 58.) The Court held a hearing on the motion on March 12, 2019. Having been fully briefed, Defendants' motion is ripe for disposition.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. See U.S. CONST. amend. IV (articulating "[t]he right of the people to be secure . . . against unreasonable searches and seizures"). "A 'seizure' occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" United States v. Wrensford, 866 F.3d 76, 85 (3d Cir. 2017) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57 (1967)). "On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).

"Under the exception to the warrant requirement established in Terry, however, 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the

officer has a reasonable, articulable suspicion that criminal activity is afoot.'" United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). Although a "Terry" stop requires only reasonable suspicion, a de facto arrest must be supported by probable cause. See United States v. Johnson, 592 F.3d 442, 447-48 (3d Cir. 2010) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).

In determining whether a law enforcement officer has acted with reasonable suspicion, "due weight must be given, not to his inchoate or unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." See Terry v. Ohio, 392 U.S. 1, 27 (1968). "Reasonable suspicion is more than 'a mere hunch . . . [but] considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause." United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018) (alteration in original) (quoting Navarette v. California, 572 U.S. 393, 397 (2014)). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). Like probable cause, reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability[,]" and "[b]oth

factors – quantity and quality – are considered in the 'totality of the circumstances' – the whole picture.'" See id. (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). As noted by the United States Court of Appeals for the Third Circuit, the applicable standard is:

> whether, at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Although "this standard 'requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Id. (citing Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995)). Further, probable cause may exist "even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." See id. (citing Gates, 462 U.S. at 243 n.13).

The requirement that there be reasonable suspicion for a Terry stop applies equally in the case of a traffic stop of a vehicle. See United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006). The process of stopping and detaining a vehicle and its occupants is a seizure under the Fourth Amendment to the United States Constitution. See Johnson, 63 F.3d at 245. To be reasonable under the Fourth Amendment, a vehicle stop must be based on reasonable suspicion, not probable cause. See Delfin-Colina, 464 F.3d at 397. Under Third Circuit precedent, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at

10

the time of the stop." See id. at 398. Moreover, "an officer need not be factually accurate in [his] belief that a traffic law had been violated but, instead, need only produce facts establishing that [he] reasonably believed that a violation had taken place." Id. The Third Circuit has described this standard as "not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts." See United States v. Fleetwood, 235 F. App'x 892, 895 (3d Cir. 2007).

To "evaluat[e] the constitutionality of a traffic stop, a court is free to examine the sufficiency of the reasons for the stop as well as the officer's credibility." See Johnson, 63 F.3d at 247; see also Delfin-Colina, 464 F.3d at 397 (acknowledging that the Court should "weigh the totality of the circumstances – the whole picture"). The Court must also consider whether the "rational inferences" from the facts presented "warrant the intrusion." See Delfin-Colina, 464 F.3d at 397. Under the "authorization test" adopted by the Third Circuit, "the validity of a traffic stop should be evaluated on the officer's objective legal basis for the stop." See Johnson, 63 F.3d at 247. If the officer possessed reasonable suspicion that the defendant violated a traffic law, the officer's subjective basis or pretextual reason for the stop is irrelevant. See id. at 247-48.

### III. DISCUSSION

#### A. Arguments of the Parties

##### 1. Defendants' Arguments in Favor of Suppression

Defendants first argue that suppression of physical evidence is warranted because Defendants responded to Officer Engle's waving motion by "attempting to drive slowly around Officer Engle's vehicle through the intersection" and that, as a result, Officer Engle lacked reasonable suspicion to attempt to conduct an investigatory stop of Defendants. (Doc. No. 41 at

11

5.)  Defendants argue, in turn, that the lack of reasonable suspicion to conduct an investigatory stop renders Officer Thorne's observation of the black handgun in plain view unlawful because Officer Thorne "did not have a right to be in the position to make that observation." (Id.) Defendants next argue that even if the initial stop by Officer Engle were proper, probable cause did not exist for a warrantless search of the entire interior of the white vehicle because both Defendants "were under arrest, handcuffed . . . and secured inside two separate police vehicles prior to the time Officer Thorne first observed the handgun in plain view in the center cup holder and then extended the search to the inside of the middle console and other areas of the interior of the vehicle." (Id. at 6.)  Lastly, Defendants contend that the search of the white vehicle conducted by Officer Thorne cannot be justified as an inventory search because it was conducted prior to the arrival of the Pennsylvania State Police.  (Doc. No. 66 at 17.)

### 2. The Government's Arguments Against Suppression

The Government argues that suppression of evidence is improper because Officer Engle had reasonable suspicion that criminal activity was afoot in that Defendants "disregarded multiple commands to turn their vehicle around, appeared to be intoxicated, and . . . proceeded to drive into a secure location that contained evidence of a suspected car theft." (Doc. No. 71 at 15-16.)  The Government contends that because Defendant Gilbert-Brown failed to obey Officer Engle's commands to stop, Officer Engle possessed reasonable suspicion that Defendant Gilbert-Brown was in violation of 75 Pa. Const. Stat. Ann. § 3733(a), which states that: "[a]ny driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2)." (Id. at 15) (citing 75 Pa.C.S.A. § 3733).  Second, the Government contends that the officers had probable cause to

arrest Defendants and search them incident to arrest because they "disobeyed repeated instructions to stop" and assaulted Officer Engle with the white vehicle. (Id. at 18.) The Government also contends that the search of the white vehicle was lawful because the search of Defendants yielded drugs and a large sum of cash. (Id. at 18-19.) Lastly, the Government argues that even if the arresting officers lacked probable cause to search the white vehicle incident to the arrest of Defendants, the "incriminating evidence discovered within the vehicle would have been discovered during the course of a lawful inventory search of the vehicle pursuant to official [Pennsylvania] State Police policy." (Id. at 19.)

### B. Whether Officer Engle Had Reasonable Suspicion to Attempt an Investigatory Stop

In weighing the totality of the circumstances and drawing all rational inferences from the facts presented, the Court concludes that Officer Engle had an objectively reasonable basis to initiate the investigatory stop. Officer Engle testified that he motioned to Defendants with a handheld flashlight to "turn around and go the other way" and gave "approximately five to six" verbal commands to "turn around." (Doc. No. 64 at 11:9-23, 14:9.) Officer Engle stated that Defendant Gilbert-Brown, the driver of the white vehicle, did not comply with his commands and motions and "continued to slowly drive and attempt to get around[] [and] squeeze in between [Officer Engle's] patrol vehicle and the wrecked Mazda." (Id. at 11:22-25.) Officer Engle also testified that Defendant Gilbert-Brown was "looking directly at [Officer Engle]" as he was giving commands (id. at 13:20-24, 18:4), and that Defendant Gilbert-Brown's eyes were "very bloodshot and had a glossy tint to them" (id. at 18:20-22). Officer Engle stated that after Defendant Gilbert-Brown "continued to try to drive through or pass through the crime scene," he gave "two to three" loud verbal commands to Defendant Gilbert-Brown to "stop the vehicle and get out and turn vehicle off." (Id. at 14:18-25.) Officer Engle's credible testimony provides

specific, articulable facts demonstrating that he possessed reasonable suspicion that by failing to observe his verbal and visual instructions to stop, Defendant Gilbert-Brown was in violation of 75 Pa. Const. Stat. Ann. § 3733(a).  Therefore, Officer Engle's attempted Terry stop constituted a reasonable seizure under the Fourth Amendment.  See Delfin-Colina, 464 F.3d at 398 (holding that a stop is reasonable under the Fourth Amendment where an officer possesses specific, articulable facts that an individual was violating a traffic law at the time of the stop).[3]

### C. Whether Officer Engle Had Probable Cause to Arrest Defendants

The Court concludes that the arrest of Defendant Gilbert-Brown and the subsequent search of him incident to his arrest was lawful under the Fourth Amendment.  "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (citing Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995)).  As detailed above, Defendant Gilbert-Brown ignored Officer Engle's repeated commands and motions to stop driving and to turn the white vehicle around and assaulted Officer Engle with the vehicle before ultimately crashing the vehicle into Officer Engle's police cruiser.  (Doc. No. 64 at 19:10-25, 20:1-5.)  As a result, at the time of his arrest, Officer Engle had probable cause to arrest Defendant Gilbert-Brown for, at a minimum, violating 75 Pa. Const. Stat. Ann. § 3733(a).[4]

---

[3] While ultimately irrelevant to the Court's disposition of Defendant's motion, Defendants' argument that Officer Thorne did not have the right to be in the position to observe the black handgun in plain view is misplaced, given the Court's determination that Officer Engle's attempt to conduct an investigatory stop was lawful.

[4] The York County criminal complaint filed against Defendant Gilbert-Brown ultimately charged him with nine offenses, three of which related to his operation of the vehicle:  (1) Aggravated Assault Against a Police Officer, in violation of 18 Pa.C.S.A. § 2702(a)(2); Recklessly Endangering Another Person, in violation of 18 Pa.C.S.A. § 2705;  and Fleeing or

Accordingly, the search of Defendant Gilbert-Brown's person incident to his arrest was lawful. That search yielded the following: "eleven clear plastic baggies; 23 U.S. twenty-dollar bills totaling $460; nine U.S. ten-dollar bills totaling $90; one U.S. five-dollar bill totaling $5; and five U.S. one-dollar bills totaling $5." (Doc. No. 64 at 137:23-25, 138:1.)

As to Defendant Deshields, who was a passenger only, and not implicated or in any ostensible way complicit in the vehicular assault, the Government argues that Officer Engle possessed probable cause to arrest him based on the following. First, Trooper Groff's report relays Officer Engle's averment that "while he was holding the two occupants [of the white vehicle] at gunpoint after they crashed into his [patrol vehicle], he noticed that the passenger was looking around as if he was considering doing something," and that "the passenger kept looking at the driver and although he had his hands up[,] he kept looking and it seemed like he was getting ready to run or put his hands down and reach for something." (Doc. No. 40-1 at 19.) Further, Officer Engle testified that "[t]here were multiple times where [Defendant Deshields] was bending over and reaching towards the floorboard of the vehicle, which [took] his hands out of plain view." (Doc. No. 64 at 23:25, 24:1-5.)

Setting aside the highly speculative testimony regarding Defendant Deshields' thoughts and intentions and crediting Officer Engle's testimony as to Defendant Deshields' furtive movements in the car while Defendant Deshields was held at gunpoint, the Court concludes that the facts confronting Officer Engle warranted Defendant Deshields' removal from the vehicle and a pat-down of his person to ensure the safety of the officers at the scene, as well as the public at large. However, Officer Engle did not choose that course of action. Instead, he chose to place

---

Attempting to Elude a Police Officer, in violation of 75 Pa.C.S.A. § 3733(a). See PA Unified Judicial System docket, Commonwealth v. Anthony Ray Gilbert-Brown, No. CP-67-CR-1874-2018.

Defendant Deshields under arrest immediately upon his removal from the vehicle.  Viewing the totality of the circumstances, the Court concludes that the facts confronting Officer Engle did not amount to probable cause justifying the arrest of Defendant Deshields for the vehicular assault committed by Defendant Gilbert-Brown.  The Court notes that, although the Government discusses both Defendants together in arguing that Defendant Gilbert-Brown's actions with regard to the operation of the vehicle constituted probable cause to arrest both Defendants, the Supreme Court "has made clear[] [that] probable cause must exist as to the particular person searched or seized."  See Ybarra v. Illinois, 444 U.S. 85, 91 (1979).  Accordingly, it follows that "a person's mere propinquity to others independently suspected for criminal activity does not, without more, give rise to probable cause to search [or seize] that person."  See id.  Therefore, because the Court finds that, at the time of Defendant Deshields' arrest, Officer Engle lacked probable cause to arrest him in connection with the vehicular assault, the Court also must find that the search of Defendant Deshields' person incident to that arrest failed to comport with the requirements of the Fourth Amendment. Thus, the items found on Defendant Deshields' person -- including: "four U.S. twenty-dollar bills, totaling $80; one ziplock bag with marijuana; one Bluntville Cigarillo; one glassine knotted bag containing white chalky substance; one Samsung flip phone; one white lighter; and one key ring with five keys" (id. at 138:5-9) – are subject to suppression and cannot permissibly support a finding of probable cause to search the vehicle driven by Defendant Gilbert-Brown.  Accordingly, the Court's assessment of whether probable cause existed for a warrantless search of the vehicle after the Defendants' arrest must proceed without reference to the aforementioned items recovered from Defendant Deshields.

> **D.** **Whether Officers Had Probable Cause to Search the Vehicle Driven by Defendant Gilbert-Brown**

Under the "automobile exception" to the warrant requirement, law enforcement may conduct a warrantless search of a vehicle if there is "probable cause to believe that the vehicle contains evidence of a crime." See United States v. Donahue, 764 F.3d 293, 299-300 (citations omitted). When an officer has probable cause to search a lawfully stopped vehicle, the existence of probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search." See United States v. Ross, 456 U.S. 798, 825 (1982). As noted above, the search of Defendant Gilbert-Brown incident to his arrest yielded the following: "eleven clear plastic baggies; 23 U.S. twenty-dollar bills totaling $460; nine U.S. ten-dollar bills totaling $90; one U.S. five-dollar bill totaling $5; and five U.S. one-dollar bills totaling $5." (Doc. No. 64 at 137:23-25, 138:1.) Defendants argue that at the time of their arrest, "no probable cause existed to support a warrantless search of the interior of the vehicle for controlled substances, drug paraphernalia, or firearms not in plain view." (Doc. No. 41 at 7.) Defendants further maintain that "[t]he discovery of one firearm in plain view did not create probable cause to believe that the vehicle contained controlled substances or other firearms in interior spaces of the vehicle not in plain view." (Id.)

The Court finds it unnecessary to determine whether the arresting officers had probable cause to search the vehicle under the automobile exception to the warrant requirement because, even assuming a lack of probable cause to search the vehicle, the Court concludes that, after Defendant Gilbert-Brown's arrest, the items in the vehicle would have been inevitably discovered through a lawful inventory search. As noted above, the Government argues that, regardless of the existence of probable cause to search the vehicle, under the circumstances present here, the white vehicle was properly subject to a warrantless inventory search prior to its impoundment, which would have led to the inevitable discovery of the evidence in the vehicle.

See Nix v. Williams, 467 U.S. 431, 447-48 (1984) (holding that "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings"). The Government maintains that the testimony offered at the hearing by Trooper Groff regarding Pennsylvania State Police ("PSP") procedures, as well as the PSP written policy governing inventory searches of vehicles in the custody of the PSP (Doc. No. 72), supports a conclusion by the Court that the white vehicle would have been subject to a warrantless inventory search comporting with the constitutional requirements of Colorado v. Bertine, 479 U.S. 367, 371-73 (1987), and that such a search would have resulted in the inevitable discovery of the evidence at issue, rendering the search of the vehicle lawful even in the absence of probable cause. The Court is persuaded by the Government's reasoning as to this point. Defendants' argument that the search of the vehicle that occurred in connection with Defendant Gilbert-Brown's arrest was not labeled an "inventory search" misses the point of the Government's argument. As long as Defendant Gilbert-Brown was lawfully stopped and arrested, which the Court has concluded, as explained supra, and given the PSP's role in this investigation and its written procedures governing inventory searches of vehicles within its custody, the vehicle at issue was subject to a lawful warrantless inventory search prior to impoundment that would have inevitably uncovered the drug and gun evidence that resulted from the search of the vehicle incident to the arrest of Defendant Gilbert-Brown. Accordingly, the evidence recovered from the vehicle is not subject to suppression.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to suppress (Doc. No. 40) will be granted in part and denied in part. An appropriate Order follows.